*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 04a0412p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 02-2394

SEAN LAMONT CROMER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 01-00130—Gordon J. Quist, District Judge.

Argued: August 13, 2004

Decided and Filed: November 30, 2004

Before: MOORE and COLE, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Timothy M. Holloway, Taylor, Michigan, for Appellant. Andrew Byerly Birge, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Timothy M. Holloway, Taylor, Michigan, for Appellant. Andrew Byerly Birge, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

ALGENON L. MARBLEY, District Judge. Defendant-Appellant, Sean Lamont Cromer, appeals his conviction by a jury for possession of cocaine with intent to distribute. On appeal, Cromer asserts the following grounds for reversal: (1) there was insufficient evidence to support his conviction; (2) the district court plainly erred by allowing a witness to testify about hearsay statements made by a confidential informant ("CI") indicating that Cromer was involved in drug activity; (3) the district court erred by not requiring the production of the CI after admitting the hearsay statements made by the CI; and (4) the district court erred by allowing Cromer to cross-examine a witness without giving him *Faretta* warnings. Jurisdiction is proper under 28 U.S.C. § 1291. For the following reasons, Cromer's conviction is **REVERSED** and this case is **REMANDED** for additional proceedings in accordance with this opinion.

_____

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

## I. BACKGROUND

### A. Procedural History

On June 6, 2001, a grand jury for the Western District of Michigan returned a two-count indictment against Cromer based upon the results of a search conducted pursuant to a warrant on March 8, 2001, at a residence located at 3284 Buchanan Avenue in Wyoming, Michigan (the "Buchanan residence"). Count I charged Cromer with being a felon in possession of a firearm "[o]n or about March 8, 2001," in violation of 18 U.S.C. §§ 922(g)(1), 921(a), and 924(a)(1). Count II charged Cromer with "knowingly, intentionally and unlawfully possess[ing] with intent to distribute . . . cocaine," in violation of 21 U.S.C. § 841(a) and (b)(1)(C). On July 10, 2001, a grand jury returned a superseding indictment, adding a third count based upon a firearm found at the time of Cromer's arrest, on May 24, 2001. Count III thus charged Cromer with being a felon in possession of a firearm "[o]n or about May 24, 2001."

At the beginning of Cromer's first trial, the district court granted Cromer's oral motion to sever the drug charge from the firearms charges and proceeded to try Cromer solely upon the drug charge. Cromer's first trial on the possession with intent to distribute charge was held on January 15, 2002, through January 18, 2002, and resulted in a hung jury. The court declared a mistrial on January 23, 2002. Cromer's second trial on the drug charge was held on May 21, 2002, through May 24, 2002. Cromer moved for a judgment of acquittal at the close of the government's case and then again moved for a judgment of acquittal at the close of all the evidence. Both motions were denied. The jury found Cromer guilty of the drug charge. Subsequently, Cromer and the government entered into a plea agreement regarding the two firearms charges, whereby Cromer agreed to plead guilty to the felon in possession charge contained in Count III and the government agreed to dismiss the felon in possession charge contained in Count I.

The district court sentenced Cromer to 294 months of imprisonment on Count II, the drug charge, and 96 months of imprisonment on Count III, the firearms charge. On November 21, 2002, Cromer filed a timely notice of appeal of his judgment of conviction on the possession with intent to distribute cocaine charge. In his plea agreement, Cromer waived the right to appeal his conviction and sentence on the felon in possession charge contained in Count III, and he does not raise any issues on appeal regarding his conviction or sentence on that charge.

### B. Factual Background[1]

### 1. Evidence of Cromer's Guilt

On March 8, 2001, a search warrant was executed at the Buchanan residence, during the course of which the following incriminating evidence was discovered:

(1)      a "pocket tech digital scale," rolling paper, and razor blades in a kitchen cupboard;

(2)      a shoe box containing a pan and knife covered in cocaine residue, a small bag of suspected marijuana, a small bag of cocaine, and small baggies in a cupboard or pantry;

(3)      two electric mixers–one that had cocaine residue on it and one that did not have any cocaine residue on it–in a kitchen cupboard;

(4)      $8,500 in cash inside an oven mitt that was resting between the refrigerator and its handle;

(5)      a loaded gun in the basement;

---

[1] The following factual background is taken from testimony provided during Cromer's second trial.

(6)     a large glass tube containing cocaine residue in a hidden corner of a kitchen cabinet;

(7)     a coffee grinder caked with cocaine residue; and

(8)     some apparent drug tabulations, mixed in with thirty to forty documents that appeared to be Cromer's.

At trial, the government introduced evidence that Cromer's fingerprints were found on the mixer with the cocaine residue, the gun, and a Pyrex dish with no cocaine residue; that Cromer had spent at least some time at the residence for the stated purpose of house sitting; that the interior of the Buchanan residence was consistent with the sort of "stash house" often used by distributors of crack cocaine; and that Cromer, when he was arrested, had on his person almost $4,000 in cash for which he provided inconsistent explanations.

## 2. Hearsay Statements

On direct examination of Maureen O'Brien, the officer in charge of the investigation of the Buchanan residence, the prosecutor asked, "Were you in charge of the investigation that led to charges against Sean Cromer?" The prosecutor also asked, "What was your role in that?" O'Brien stated in response, "My partner and I, Officer Galloway, back in January of 2001, had information about 3284 Buchanan. And we began an investigation about this residence being associated with selling drugs." The prosecutor then asked, "By investigating the place, did you come up with enough information that a state court judge gave you an order to go and have the place searched?" O'Brien responded by saying, "Yes."

The prosecutor also engaged in the following colloquy with O'Brien:

Q       . . . .

        Was there a period or a time set where you would meet with other officers that were going to assist you in getting ready to conduct the search of Buchanan Street?

A       Yes. . . .

. . . .

Q       Now, during the course of that meeting, from the information available to you, did some names come up or some descriptions of people come up that you told the officers you thought might be there?

A       Yes.

Q       And can you tell us what was the name or names that you had of people that were associated with that place from your investigation that you told the officers to be on the lookout for?

A       Well, the focus of our investigation were [sic] for two subjects: one being a person nicknamed Nut, which is Mr. Sean Cromer. The second individual who was the subject of this investigation was Quincy Hatcher.

Q       Now you knew the name Nut. Did you know the defendant's nickname before the date of the search?

A       Yes.

Q          And what was the nickname that you knew him by?

A          Peanut.

Q          Did you actually know his name as Sean Cromer before the search?

A          Not until we got inside.

The prosecutor then proceeded to question O'Brien regarding the search.  Neither the prosecutor nor O'Brien mentioned during this line of questioning that O'Brien had received a tip from an informant.

On cross examination, the following exchange took place between Cromer's defense counsel and O'Brien:

Q          And in this particular affidavit, you talked about an informant who had gone into the home at Buchanan and saw cocaine being purchased there.  Is that correct?

A          That's correct.

. . . .

Q          And that within the past 36 hours of the time that you prepared your affidavit, that your informant had been in that house?

A          Yes.

Q          So when I asked you [the] question about purchasing drugs, you're swearing to Judge Timmers that actually he had been in there within -- I say he -- he or she had been in within 36 hours and could purchase drugs and saw drugs there?

A          That's correct.

. . . .

Q          Was there surveillance of the home within 36 hours?

A          Yes, there was.

. . . .

Q          During this 36 hours, did you see Sean Cromer either go into or come out of that home?

A          I did not see him physically, no.

Then, still on cross examination, the following exchange took place between Cromer and O'Brien[2]:

Q          Did the informant give you the description of the person?

A          Of both people, yes.

---

[2]At this point, Cromer was conducting the cross examination with his counsel's assistance.

Q       He said both people?

A       Yes.

Q       Did he give you a description of Mr. Cromer?

A       Yes.

Q       He did?

A       Um-hum.

Q       Did the informant give you the name of the person doing the selling?

A       Yes.

Q       So the informant --

THE COURT:  Just a minute.  Let's have a side bar over here.

. . . .

THE COURT:  Mr. Cromer, you're killing yourself.

DEFENDANT CROMER:  No, I ain't.

MR. COURTADE [government's counsel]:  I was about to object to hearsay, but you're going to open the door to allowing me to respond to what did the informant say about you, and that could hurt you definitely.

DEFENDANT CROMER:  But what I'm leading to is the affidavit.  You made a[n] affidavit; and, in the affidavit, you gave a description.  It never said nothing about the two people.  You said one person.

. . . .

THE COURT:  . . . . What I'm concerned about is I don't know what the next question is going to be.  But if the next question is did -- she said that, yes, the informant identified -- described you, that never would have come in otherwise.

DEFENDANT CROMER:  She didn't say he described me.

THE COURT:  She just did.

DEFENDANT CROMER:  Okay.  I can go back to other testimony where she said that the informant didn't describe nobody.

THE COURT:  Okay.  Okay.  So that would discredit her.  I just want to --

DEFENDANT CROMER:  She before that, she didn't know nothing about me.

THE COURT:  Okay.

(End of bench conference.  In open court:)

. . . .

BY DEFENDANT CROMER:

. . . .

Q       And was your statement truthful and factual when you said that the person who gave the description of the person selling the drugs was a 25-year-old?

A       Yes.  That was -- yes.

Q       Did it prove to be true?

A       I'm sorry?

Q       Did it prove to be true that it was a 25-year-old doing the selling?

. . . .

A       Well --

        MR. COURTADE:  Your Honor, I'm going to object because that's a conclusion I believe that the jury is being called upon to make.  It would be improper for her to give her own opinion.

        THE COURT:  I think the question can be rephrased.  But sustained as to the form of that question.

After the district court sustained this objection, Cromer moved to a different line of questioning.

        Subsequently, on redirect, the following exchange occurred between the government's counsel and O'Brien:

A       The description was for a black male, darker skinned, five-seven, 200 pounds, and 25 years.

Q       Now, who provided that?  It was alluded to that you provided that description.  Where did that description come from?

A       That description came from the informant.

Q       That was not your description to the Judge.  That was the informant's description?

A       That's correct.

Q       Now, how does that description compare with Quincy Hatcher?

A       He's more -- Mr. Cromer is stockier, smaller and stockier.  Mr. Hatcher is like five-eleven, 150 pounds.  He's more of a bean pole than stocky.

Q       So the description that you provided, which of the two individuals that you know -- Quincy Hatcher and Sean Cromer -- who does it more -- the informant's description more closely match?

A       It more accurately depicts Mr. Cromer.

In his rebuttal closing statement, the government's counsel commented on the description of Cromer provided by the informant. The government's counsel stated,

> This individual was a confidential informant. But what they have said was pretty darn accurate. Okay. They're off by ten years on age. I'm not a very good judge of age. Mr. Kaczor [defense counsel] kept saying it was Ms. O'Brien's description. She did not describe him. It was the informant's description. Black male, 25, five-seven, 200 pounds.

### 3. Cromer's Participation at Trial

During defense counsel's cross-examination of O'Brien, defense counsel indicated to the court that Cromer wanted to participate in the cross-examination of O'Brien, and possibly the examination of other witnesses and closing argument. While Cromer's participation was being discussed, the government's counsel stated, "Unless his questions are scripted and defense counsel has looked at them, it could open doors to other evidence that he might not want to have come in." Initially the district judge was not going to allow Cromer to cross-examine O'Brien because defense counsel had already started cross examining her, though the judge indicated that he would allow Cromer to examine other witness and participate in closing argument. Defense counsel, however, again raised Cromer's concerns. At a side bar during defense counsel's cross-examination of O'Brien, the following exchange took place:

> MR. KACZOR [defense counsel]: . . . . Mr. Cromer is upset, basically saying that he has a number of questions that he believes I am covering at this point but that he would cover them in a much more effective manner. So he doesn't want me to ask those questions. He wants me to stop asking questions so that he can then ask the questions himself.
>
> . . . .
>
> THE COURT: . . . .
>
> Mr. Cromer, what would you -- I'm going to give about a five-minute demonstration here -- give you a chance for a five-minute demonstration to see what you're going to do. This is a new legal issue to me. You have the right to try your case without a lawyer. I don't know that you can try your case 50 percent without a lawyer. But let's see what you do here.

After the court had excused the jury, the district judge allowed Cromer to practice cross examining O'Brien. During this practice, the district judge told Cromer that he was being argumentative and also indicated that one of his questions was inappropriate. Cromer stated during this practice, "I can always consult my counsel as far as anything that may be something that shouldn't be appropriately asked." Then, the following dialogue ensued:

> THE COURT: Let me just tell you my observations about it. I think that, quite frankly, you're respectful when you ask questions, and I think you're doing your best to ask the questions. You have to be careful about being argumentative. From my perspective, looking at it as a judge -- and I'm not the judge of the facts in this case -- your client -- or, your counsel is more effective than you are in asking the questions. But it's your case. As you say, you are the person facing a heavy jail sentence if you get convicted. All I can do and all your lawyer can do is give you advice; although, I could prevent you from asking questions. But it does not seem to be a disruptive procedure to me.
>
> I'm willing to hear both the government and Mr. Kaczor on this.
>
> . . . .
>
> MR. COURTADE: I guess our basic position is we'll try anything once.

THE COURT:  Well, it's different.  But, you know, it's his life.  And if he's more comfortable doing this, and if he behaves appropriately, -- and I am questioning a little bit . . . a person has the right to represent himself.  What has never been decided, as far as I know, is can he represent himself 50 percent or 65 percent or 35 percent.  I don't know.

. . . .

MR. KACZOR:  In this circuit, I have been appointed as what the Court calls stand-by counsel on some of these tax protester cases.  Essentially, what I have done is sat by and advised the defendant, given him my best advice.  And at times, the defendant questioned witnesses; and at times, I questioned witnesses.  I think that's somewhat what Mr. Cromer wants. . . . It's somewhat frustrating to me to represent him and get all these questions he wants.  I think there is more to just what's on the written page.  I think it's important to allow him to continue if that's what he wants.

THE COURT:  All right.

MR. COURTADE:  Your Honor, what I would -- again, what I do not want is the tag-team approach when both of them get up.

THE COURT:  Mr. Cromer is going to have to finish it.

. . . .

THE COURT:  I'll give him any opportunity to consult with Mr. Kaczor when he wants, too.  For example, if there is an objection, sometimes a simple rephrasing of the question can take care of it.  And so you'll be literally stand-by counsel, Mr. Kaczor, because I want you to stand right next to him while he does this.

MR. KACZOR:  I have no objection to whatever the Court would like to do to accommodate Mr. Cromer.

THE COURT:  All right.

Mr. Cromer, do you want to do it that way?

DEFENDANT CROMER:  He can sit down, or he can stand next to me.  I don't have a problem with it.  Basically, the questions is [sic] "Yes" or "No" questions.

. . . .

THE COURT:  I'll have the jury come back, and I'll explain to them that Mr. Cromer wants to take a more active role in his own defense.  And he is not firing his counsel or anything, but he wants to ask the questions and that Kaczor will be standing by Mr. Cromer to help him phrase the questions correctly and to consult with Mr. Cromer whenever he wants.

The district judge stated several times both in and out of the presence of the jury that Cromer was not firing his counsel. After Cromer conducted a large portion of the cross-examination of O'Brien, the district judge, outside the presence of the jury, told Cromer and his counsel to speed up the cross-examination and indicated on the record "that there are long discussions before each -- almost every question now." The court instructed defense counsel to "go over" the rest of the questions with Cromer, and defense counsel did so. Additionally, on redirect examination of O'Brien, the district judge allowed defense counsel to make

objections on behalf of Cromer, and it appears that defense counsel conducted the recross-examination of O'Brien.

## II. ANALYSIS

Cromer argues that his conviction cannot stand for the following reasons: (1) there was insufficient evidence to support his conviction; (2) the district court plainly erred by allowing a witness to testify about hearsay statements made by a confidential informant ("CI") implicating Cromer in drug activity; (3) the district court erred by not requiring the production of the CI after admitting the hearsay statements made by the CI; and (4) the district court erred by allowing Cromer to cross-examine a witness without giving *Faretta* warnings.

In light of *Crawford v. Washington*, 124 S. Ct. 1354 (2004), decided after the briefing in this case was complete, the Court holds that statements of a confidential informant are testimonial in nature and therefore may not be offered by the government to establish the guilt of an accused absent an opportunity for the accused to cross-examine the informant. The government in this case did offer certain statements made by a CI for the purpose of establishing the truth of the matter asserted. The admission of these statements amounted to plain error, so Cromer's conviction must be reversed.

On retrial, because the district court may face issues regarding Cromer's participation in his defense that are similar to the issues encountered in the previous trial, the Court also decides Defendant-Appellant's *Faretta* claim in order to provide guidance to the district court on remand. Due to our resolution of the Confrontation Clause issue, however, we need not reach either of the other matters raised by Cromer on appeal.

### A. Confrontation Clause

The Confrontation Clause of the Sixth Amendment states, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Prior to *Crawford v. Washington*, 124 S. Ct. 1354 (2004), the admissibility of out-of-court statements under the Confrontation Clause was governed by *Ohio v. Roberts*, 448 U.S. 56 (1980). According to *Roberts*, an unavailable witness's out-of-court statement could be admitted against the accused if the statement had adequate indicia of reliability. *Roberts*, 448 U.S. at 66. A statement was considered to have sufficient indicia of reliability if it either fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Id.*

*Crawford* involved a tape-recorded statement given by the defendant's wife to the police describing the stabbing with which the defendant was charged. Pursuant to the state marital privilege, the defendant's wife did not testify at trial, so the defendant had no opportunity to cross-examine her. The statement nevertheless was admitted at trial, over the defendant's objections, because the trial court determined that the statement had "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66.

The Supreme Court, in *Crawford*, introduced a fundamental re-conception of the Confrontation Clause. The Court reaffirmed the importance of the confrontation right and introduced a distinction between testimonial and nontestimonial statements for Confrontation Clause purposes: "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'"[3] *Crawford*, 124 S. Ct. at 1370. The Court based this distinction on the word "witnesses" in the Clause, which refers to those who "bear testimony." *Id.* at 1364 (quoting 1 N. Webster, *An American Dictionary of the English Language*

---

[3]The Court found the admission of statements deemed reliable by a judge to be fundamentally at odds with the right of confrontation: "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Crawford* at 1370-71.

(1828)). Ultimately, the Court's holding was that testimonial, out-of-court statements offered against the accused to establish the truth of the matter asserted may only be admitted where the declarant is unavailable and where the defendant has had a prior opportunity to cross-examine the declarant. *Id.* at 1369, 1374. While the Court declined to "spell out a comprehensive definition of 'testimonial,'" it stated that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 1374. The Court found that the defendant's wife's tape-recorded statement was "testimonial under any definition," *id.* at 1370, and accordingly reversed the defendant's conviction, *id.* at 1374.

There are three categories of statements in the case sub judice that the Confrontation Clause arguably should have excluded. First is the testimony provided by O'Brien in the government's case-in-chief in which O'Brien describes the commencement of the investigation based on information she and her partner had regarding the Buchanan residence. Second is testimony O'Brien provided on direct examination relating to information she had before the search on a man nicknamed "Nut." Third is O'Brien's testimony, given on redirect examination, in which she furnishes and discusses the physical description given to her by the CI. The description was for an alleged drug distributor operating out of the Buchanan residence. O'Brien stated on redirect, and the government argued in closing, that the description more closely matched Cromer than Hatcher.

At trial, Cromer did not object to any of these statements. When an appellant fails to object to an error in the district court, this Court reviews for plain error. Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998). Plain error review applies even if the forfeited assignment of error is a constitutional error. *United States v. Jones*, 108 F.3d 668, 676 (6th Cir. 1997). Pursuant to plain error review, an appellate court may only correct an error not raised at trial if there is "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Johnson* at 467 (quoting *Olano*, 507 U.S. at 732) (internal quotation marks omitted).

The threshold determination that we must make is whether the statements of a confidential informant to police are "testimonial" in nature. While the *Crawford* Court did not provide a comprehensive definition of "testimonial," it did provide some guidance in the matter. For example, the Court noted that "testimony" may be defined as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford* at 1364 (quoting 1 N. Webster, *An American Dictionary of the English Language* (1828)). The Court emphasized that, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 1364. The Court mentioned various formulations that had been proposed to define the class of "testimonial" statements[4] but found no need to choose among those formulations since "[s]tatements taken by police

---

[4] The Court included the following "formulations of this core class of 'testimonial' statements":

> "*ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois*, 502 U.S. 346, 365, 112 S. Ct. 736, 116 L.Ed.2d 848 (1992) (THOMAS, J., joined by SCALIA, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 3.

officers in the course of interrogations," such as the defendant's wife's tape-recorded statement, are "testimonial under even a narrow standard." *Id.* at 1364 ("Police interrogations bear a striking resemblance to examinations by justices of the peace in England.").

The Court examined the historical underpinnings of the Confrontation Clause, concluding that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 1363. The Court detailed one of the "most notorious instances of civil-law examination"–the 1603 trial of Sir Walter Raleigh for treason. *Id.* at 1360. There, Lord Cobham, Raleigh's alleged accomplice, had implicated Raleigh in an examination before the Privy Council and in a letter. *Id.* Raleigh argued that Cobham had lied to save himself and demanded the right to confront his accuser face-to-face. *Id.* Raleigh's judges refused to call Cobham to appear, and Raleigh was found guilty and sentenced to death. *Id.* Out of such abuses was the English right of confrontation, used as a model for our Confrontation Clause, born. *Id.*

Additional guidance may be found by looking to the sources upon which the *Crawford* Court relied in framing its re-definition of the Confrontation Clause. For example, the Court cites to works by two leading constitutional scholars–Professor Akhil Reed Amar of Yale Law School and Professor Richard Friedman of University of Michigan Law School–both of whom have been closely associated with the testimonial approach to the Confrontation Clause. Professor Amar contends that the Clause encompasses "those 'witnesses' who testify either by taking the stand in person or via government-prepared affidavits, depositions, videotapes, and the like." Akhil Reed Amar, *Confrontation Clause First Principles: A Reply to Professor Friedman*, 86 Geo. L.J. 1045, 1045 (1998). Professor Friedman, in contrast, urges a broader definition of "testimonial" that would include any statement "made in circumstances in which a reasonable person would realize that it likely would be used in investigation or prosecution of a crime." Richard D. Friedman & Bridget McCormack, *Dial-In Testimony*, 150 U. Pa. L. Rev. 1171, 1240-41 (2002). Based on his proposed definition, Friedman offers five rules of thumb:

> A statement made knowingly to the authorities that describes criminal activity is almost always testimonial. A statement made by a person claiming to be the victim of a crime and describing the crime is usually testimonial, whether made to the authorities or not. If, in the case of a crime committed over a short period of time, a statement is made before the crime is committed, it almost certainly is not testimonial. A statement made by one participant in a criminal enterprise to another, intended to further the enterprise, is not testimonial. And neither is a statement made in the course of going about one's ordinary business, made before the criminal act has occurred or with no recognition that it relates to criminal activity.

Richard D. Friedman, *Confrontation: The Search for Basic Principles*, 86 Geo. L.J. 1011, 1042-43 (1998) [hereinafter Friedman, *Confrontation*].

Since *Crawford*, other Circuits have begun to work toward developing a more comprehensive definition of "testimonial." *See United States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004) ("*Crawford* at least suggests that the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial."); *see also Horton v. Allen*, 370 F.3d 75, 84 (1st Cir. 2004) (finding statements made in private conversation between private individuals not to be testimonial because "[t]hey were not ex-parte in-court testimony or its equivalent; were not contained in formalized documents such as affidavits, depositions, or prior testimony transcripts; and were not made as part of a confession resulting from custodial examination" and they were not made "under circumstances in which an objective person would 'reasonably believe that the statement would be available for use at a later trial'" (quoting *Crawford*, 124 S. Ct. at 1364)). In *United States v. Silva*, 380 F.3d 1018 (7th Cir. 2004), the Seventh Circuit denounced the practice of law enforcement officials, under the guise

---

*Crawford* at 1364.

of demonstrating the reason for a particular investigation, testifying at trial as to statements made by confidential informants. The court strongly suggested that statements by a CI are testimonial in nature:

> Under the prosecution's theory, every time a person says to the police "X committed the crime," the statement (including all corroborating details) would be admissible to show why the police investigated X. That would eviscerate the constitutional right to confront and cross-examine one's accusers. *See Crawford v. Washington*, --- U.S. ----, 124 S. Ct. 1354, 158 L.Ed.2d 177 (2004).

*Silva*, 380 F.3d at 1020.

We find the definition of "testimonial" proposed by Professor Friedman to be both well-reasoned and wholly consistent with the purpose behind the Confrontation Clause. As emphasized by *Crawford*, the Confrontation Clause refers to those who bear testimony against an accused. Statements "made to the authorities who will use them in investigating and prosecuting a crime, . . . made with the full understanding that they will be so used," are precisely the sort of accusatory statements the Confrontation Clause was designed to address. Friedman, *Confrontation*, 86 Geo. L.J. at 1025. Certainly Lord Cobham, who accused Sir Walter Raleigh of treason, fell into this category.

Professor Friedman's definition is somewhat broader than Professor Amar's definition, which would implicate the Confrontation Clause only in the instance of formalized statements–such as affidavits, depositions, and government-prepared recordings–made directly to the authorities. As explained by Professor Friedman, however, the broader definition "is necessary to ensure that the adjudicative system does not effectively invite witnesses to testify in informal ways that avoid confrontation." Friedman, *Confrontation*, 86 Geo. L.J. at 1043. The *Crawford* Court found the absence of an oath not to be determinative in considering whether a statement is testimonial. *Crawford*, 124 S. Ct. at 1364-65. We are unable to discern how the additional formalities identified by Professor Amar are necessary components of a testimonial statement.

Indeed, the danger to a defendant might well be greater if the statement introduced at trial, without a right of confrontation, is a statement volunteered to police rather than a statement elicited through formalized police interrogation. One can imagine the temptation that someone who bears a grudge might have to volunteer to police, truthfully or not, information of the commission of a crime, especially when that person is assured he will not be subject to confrontation. Professor Friedman's concern becomes especially meaningful in such a context. If the judicial system only requires cross-examination when someone has formally served as a witness against a defendant, then witnesses and those who deal with them will have every incentive to ensure that testimony is given informally.[5] The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.

Considered within such a framework, statements of a confidential informant are testimonial. Indeed, such statements fall squarely within Professor Friedman's paradigm: "A statement made knowingly to the authorities that describes criminal activity is almost always testimonial." Friedman, *Confrontation*, 86 Geo. L.J. at 1042. Tips provided by confidential informants are knowingly and purposely made to authorities, accuse someone of a crime, and often are used against the accused at trial. The very fact that the informant is confidential–*i.e.*, that not even his identity is disclosed to the defendant–heightens the dangers involved in allowing a declarant to bear testimony without confrontation. The allowance of anonymous accusations of crime without any opportunity for cross-examination would make a mockery of the Confrontation Clause.

---

[5] Professor Friedman gives the example of a private rape counselor who is able to assure a victim that she may give a videotaped statement, without going under oath, that will be provided to prosecutors and used against the perpetrator with little risk that she will have to testify in court and face cross-examination. Friedman, *Confrontation*, 86 Geo. L.J. at 1040-41.

*Cf. Silva*, 380 F.3d at 1020 ("This court has warned against the potential for abuse when police testify to the out-of-court statements of a confidential informant.").

Given that statements by a confidential informant are testimonial and thus are subject to the dictates of the Confrontation Clause, the next question is whether any of the testimony provided by O'Brien implicates the Clause. For purposes of this analysis, the objectionable statements made by O'Brien may be divided into three categories. The first set of objectionable testimony was provided in the following exchange in O'Brien's direct examination:

Q     . . . .

Were you in charge of the investigation that led to charges against Sean Cromer?

A     Yes.

Q     What was your role in that?

A     My partner and I, Officer Galloway, back in January of 2001, had information about 3284 Buchanan. And we began an investigation about this residence being associated with selling drugs.

Q     By investigating the place, did you come up with enough information that a state court judge gave you an order to go and have the place searched?

A     Yes.

Cromer's Confrontation Clause rights were not violated by this testimony. This exchange at least arguably did not even put before the jury any statements made by the CI. *See United States v. Dunbar*, No. 02-10564, 2004 WL 1614932, at *1 (9th Cir. July 19, 2004) (finding no Confrontation Clause violation where no testimonial evidence provided by CI was ever introduced into evidence); *United States v. Stone*, 222 F.R.D. 334, 339 (E.D. Tenn. 2004) (same). Even if testimonial statements of an out-of-court declarant were revealed by this testimony, Cromer's confrontation right was not implicated because the testimony was provided merely by way of background. *See United States v. Martin*, 897 F.2d 1368, 1371-72 (6th Cir. 1990) (finding Confrontation Clause not implicated where assertions not offered for their content, but merely to explain why government commenced investigation). The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 124 S. Ct. at 1369 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)). Any out-of-court statements alluded to by O'Brien at this juncture served the purpose of explaining how certain events came to pass or why the officers took the actions they did.[6] Because the statements were not offered to establish the truth of the matter asserted, the Confrontation Clause does not apply.

The second category of testimony that potentially violated the Confrontation Clause includes O'Brien's statements, also provided on direct examination, regarding information about a person nicknamed "Nut." When asked what names she had, prior to executing the search, of persons involved with illegal activities at the Buchanan residence, O'Brien replied, "Well, the focus of our investigation were [sic] for two subjects: one being a person nicknamed Nut, which is Mr. Sean Cromer. The second individual who was the subject of this investigation was Quincy Hatcher." This testimony was not offered merely to explain why a government investigation was undertaken or to demonstrate the effect of the out-of-court statements on the officers. *Cf. Martin*, 897 F.2d at 1371 ("In some circumstances, out of court statements offered for the limited purpose of explaining why a government investigation was undertaken have been determined not to be hearsay."). Rather, the purpose of this testimony could only have been to help

---

[6]For the same reason, O'Brien's statements here also did not contain inadmissible hearsay.

establish that the person nicknamed "Nut" or "Peanut," which the prosecution demonstrated elsewhere in the trial was Sean Cromer's nickname,[7] had been involved with the illegal drug activity occurring at the Buchanan residence. *See United States v. Fountain*, 2 F.3d 656, 669 (6th Cir. 1993) (concluding that, where the reason for focusing officers' search on a particular room was not at issue in the case, out-of-court statement purportedly offered to establish that reason was, in actuality, offered to prove the truth of the matter asserted); *Stewart v. Cowan*, 528 F.2d 79, 86 n.4 (6th Cir. 1976) (finding Confrontation Clause and hearsay violations where out-of-court statements implicated defendant as the perpetrator of the crime and thus went "to the very heart of the prosecutor's case").

*Crawford* held that when testimonial, out-of-court statements of an unavailable declarant are offered to prove the truth of the matter asserted, the admission of those statements violates the Confrontation Clause unless the defendant has had an opportunity to cross-examine the declarant. O'Brien's testimony about "Nut" is distinguishable from her earlier background testimony for several reasons. Not only did the testimony about "Nut" more clearly place before the jury information provided by a CI, but this second category of testimony also implicated Cromer in a way that went "to the very heart of the prosecutor's case." *Stewart*, 528 F.2d at 86 n.4. In the earlier testimony, O'Brien had merely stated that she "had information" about the Buchanan residence that led her to begin an investigation. O'Brien thus alluded, in the vaguest possible terms, to the statements made to her by a CI; she also manifestly linked those out-of-court statements with action taken by her and her partner. Furthermore, that brief explanation for why the government began its investigation of the Buchanan residence at least arguably provided some assistance to the jury in understanding the background of the case.

O'Brien's testimony about "Nut," by contrast, explicitly, albeit not directly, informed the jury that someone had implicated Nut in illegal activities. The prosecutor attempted to link this statement by a CI with an action taken by O'Brien; however, any such linkage is a sham.[8] The central issue at Cromer's trial was not whether illegal activity occurred at the Buchanan residence, but whether Cromer knowingly participated in that illegal activity. The evidence on this point was so tenuous that the jury in Cromer's first trial was unable to convict him.[9] Because there was no dispute as to the subjects of the government's investigation or the reason those subjects were believed to be involved, evidence that the government focused its investigation on Nut is helpful to the jury only insofar as it relates to the difficult question of whether Cromer was involved in the illegal activity. *See Silva*, 380 F.3d at 1020 ("If a jury would not otherwise understand why an investigation targeted a particular defendant, the testimony could dispel an accusation that the officers were officious intermeddlers staking out [the defendant] for nefarious purposes. No such argument was made in this case, however, and no other explanation was given why the testimony would be relevant."); *Fountain*, 2 F.3d at 669 (finding the only possible conclusion to be that statement was offered for truth where purported reason for offering statement was to establish immaterial issue); *Stewart*, 528 F.2d at 88 (finding the admission of highly inculpatory out-of-court statement to violate Confrontation Clause). In other words, we are forced to conclude that the purpose of this testimony was to establish the truth of the matter asserted: to prove that Cromer was, indeed, involved in the illegal activity, as stated by the CI. Because there was a testimonial, out-of-court statement, offered to establish the truth of the matter asserted, and Cromer was provided no opportunity to cross-examine the CI, Cromer's Sixth Amendment confrontation right was violated by the introduction of this second set of testimony.

---

[7]For example, Cromer's girlfriend, Felicia Crawford, testified that she knew Cromer only as "Peanut."

[8]The government's counsel, rather than asking O'Brien what information she had about suspects, asked her what suspects she told the officers conducting the search to be on the lookout for.

[9]The evidence of Cromer's guilt boils down to the following: (1) Cromer had spent some amount of time in the Buchanan residence; (2) alleged drug tabulations were found among paperwork containing Cromer's name; (3) Cromer's fingerprint was found on a mixer that had cocaine residue; (4) Cromer's fingerprint was found on a loaded gun in the basement of the Buchanan residence; and (5) Cromer had almost $4,000 in cash on his person when he was arrested, over two months after the raid on the Buchanan residence.

The third category of objectionable testimony is O'Brien's testimony on redirect examination regarding the physical description provided by the CI. As we have already established, the out-of-court statements of the CI were testimonial in nature, and Cromer had no opportunity to cross-examine the CI. Moreover, the physical description was provided to the jury for the purpose of establishing the truth of the matter asserted–that Cromer, who met the description, had participated in the illegal activity at the Buchanan residence.[10] The only question regarding this third set of testimony is whether the fact that Cromer opened the door to this testimony somehow acts to preclude the testimony from violating the Confrontation Clause. The government argues that any error in the admission of this testimony is error that Cromer invited or provoked as part of a failed defense strategy and, thus is not reversible error. As *Crawford* demonstrates, however, the Confrontation Clause, when properly applied, is not dependent upon "the law of Evidence for the time being." *Crawford*, 124 S. Ct. at 1364, 1370 (quoting 3 J. Wigmore, *Evidence* § 1397, p. 101 (2d ed. 1923)) ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence . . . ."); *see also* Friedman, *Confrontation*, 86 Geo. L.J. at 1020 ("[W]e might well pause at a doctrine that in effect conforms a constitutional right, a part of the Bill of Rights, to the contours designed–in a process not bearing the remotest resemblance to the amendment procedure established by Article V of the Constitution–by a committee of drafters of evidentiary rules for the federal courts.").

As a matter of modern evidence law, the district court may well have been correct in admitting O'Brien's redirect testimony about the description provided by the informant since Cromer, on cross-examination, had opened the door to the subject by asking about that description.[11] *See United States v. Ramos*, 861 F.2d 461, 468 (6th Cir. 1988) (finding no violation of confrontation right when defendant, on cross-examination, had opened door for government's line of inquiry); *United States v. Wynn*, 845 F.2d 1439, 1443 (7th Cir. 1988) ("It is clear from the record that [the defendant] opened the door to this line of questioning when he tried to impeach [the government agent] on the issue of his motive for investigating [the defendant]. By questioning [the agent's] motives, [defendant's] counsel was attempting to further his own theory that [defendant] was framed. . . . On redirect examination the government merely clarified the basis for [the agent's] suspicion of [the defendant]."); *United States v. Walker*, 421 F.2d 1298, 1299-1300 (3d Cir. 1970) (stating that a defendant can, "by cross-examination of a witness[,] . . . open the door for the admission on redirect examination of matters tending to support the case, which would not have been admissible on the case in chief"). Cromer and his counsel, on cross-examination, introduced the existence of an informant and a description provided by that informant in an attempt to discredit the government's case by emphasizing the limited information tying Cromer to the Buchanan residence prior to the execution of the warrant. Even after Cromer was warned that this line of questioning would open the door to allow the government to question O'Brien about the exact content of the informant's statements, Cromer continued in his attempt to establish that the informant's statement did not describe him. On redirect examination, the government merely clarified the precise nature of the description provided by the CI.

The pertinent question, however, is not whether the CI's statements were properly admitted pursuant to "the law of Evidence for the time being." *Crawford*, 124 S. Ct. at 1364. Rather, the relevant inquiry is whether Cromer's right to confront the witnesses against him was violated by O'Brien's redirect testimony. If there is one theme that emerges from *Crawford*, it is that the Confrontation Clause confers a powerful and fundamental right that is no longer subsumed by the evidentiary rules governing the admission of hearsay statements. Thus, the mere fact that Cromer may have opened the door to the testimonial, out-of-court statement that violated his confrontation right is not sufficient to erase that violation. In this, too, we agree

---

[10] Any potential doubts about whether these statements were offered for the truth of the matter asserted is resolved by the prosecutor's closing argument, wherein the government's counsel argued that Cromer was guilty because he matched the description offered by the CI.

[11] We need not devote much attention to the question of whether the Confrontation Clause was violated by any of the evidence admitted during O'Brien's cross-examination since "a party may not complain on appeal of errors that he himself invited or provoked." *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir. 1991).

with Professor Friedman, who has postulated that a defendant only forfeits his confrontation right if his own wrongful conduct is responsible for his inability to confront the witness. Friedman, *Confrontation*, 86 Geo. L.J. at 1031. If, for example, the witness is only unavailable to testify because the defendant has killed or intimidated her, then the defendant has forfeited his right to confront that witness. A foolish strategic decision does not rise to the level of such misconduct and so will not cause the defendant to forfeit his rights under the Confrontation Clause. O'Brien's redirect testimony relating the CI's physical description therefore violated Cromer's right of confrontation.

The only question remaining in our Confrontation Clause analysis is whether the two violations of the Clause that we have identified amounted to plain error. We already have found that there was error. In light of *Crawford*, the error is "plain." Based on *Crawford*'s affirmation of the importance of the constitutional right of confrontation, we readily can determine that Cromer's substantial rights were affected by these violations. In the context of a case as close as this one on the central issue of whether the defendant was involved in any illegal drug activities, the admission of these statements directly tying Cromer to the crime likely impacted the outcome of the trial. Because this plain error compromised the fairness and integrity of Cromer's trial, we **REVERSE** the judgment of the district court and **REMAND** this case for a new trial in accordance with this opinion.

## B. *Faretta* Warnings

Cromer argues on appeal that the district court violated his rights under the Sixth Amendment by failing to give him *Faretta* warnings and to make an explicit finding that he knowingly and voluntarily waived his right to counsel before allowing him to conduct part of the cross-examination of O'Brien. When reviewing an alleged deprivation of a defendant's right to counsel, this court reviews for clear error the district court's factual findings and reviews de novo the district court's legal conclusions. *United States v. Cope*, 312 F.3d 757, 772 (6th Cir. 2002), *cert. denied*, 124 S. Ct. 198 (2003).

The Supreme Court has held that a criminal defendant has a constitutionally protected right to present his own defense in addition to a constitutionally protected right to be represented by counsel. *Faretta v. California*, 422 U.S. 806, 833-34 (1975). By electing to exercise his constitutional right to present his own defense, a defendant necessarily waives his constitutional right to be represented by counsel. *United States v. Mosley*, 810 F.2d 93, 97 (6th Cir. 1987) ("'The right to defend *pro se* and the right to counsel have been aptly described as "two faces of the same coin," in that waiver of one right constitutes a correlative assertion of the other.'" (quoting *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970))). This waiver of counsel must be knowing and voluntary. *Faretta*, 422 U.S. at 835. This Court has adopted a rather lengthy series of questions from 1 *Bench Book for United States District Judges* 1.02-2 to -5 (3d ed. 1986) that a district court should ask in order to ensure that a defendant's waiver of counsel is knowing and intelligent. *United States v. McDowell*, 814 F.2d 245, 247, 250 (6th Cir. 1987). Substantial compliance with this series of questions is sufficient. *United States v. Miller*, 910 F.2d 1321, 1324 (6th Cir. 1990); *United States v. Grosshans*, 821 F.2d 1247, 1250-51 (6th Cir. 1987).

Defendant-Appellant contends that a proper waiver of his right to counsel was required even though he sought a hybrid form of representation rather than total self-representation because he sought to take on some of the core functions of counsel. Cromer argues that the district court erred both by failing to ensure that he had knowingly and intelligently made the necessary waiver and by failing to make a specific finding of knowing and intelligent waiver. While the trial court did state that it thought Cromer's counsel could do a better job and did indicate that Cromer would have to comply with the Federal Rules of Evidence, Defendant-Appellant contends that the trial court committed reversible error by failing to address Cromer in a manner substantially similar to the colloquy mandated by *McDowell*.

The United States asserts that there was no reason for the district court to secure a waiver of the right to counsel because Cromer never unequivocally asked to proceed *pro se*. Indeed, Defendant-Appellant did not actually proceed without the assistance of counsel when he questioned the witness because his attorney

stood next to him at the podium during the questioning, conferred with him before virtually every question, and continued to make objections on this behalf and make interjections on the record when necessary. The government contends that to the extent a waiver of counsel was required, Cromer effectively waived that right. Finally, the government maintains that even if there was any error, that error was harmless.

There is conflicting authority on the issue of when *Faretta* warnings are required. A number of courts have held that there is a presumption against a waiver of counsel, and that *Faretta* warnings are only required when a defendant has clearly and unequivocally asserted his right to proceed *pro se*. *Buhl v. Cooksey*, 233 F.3d 783, 790 (3d Cir. 2000) ("Courts must indulge every reasonable presumption against a waiver of counsel. In order to overcome this presumption, and conduct his/her own defense, a defendant must clearly and unequivocally ask to proceed *pro se*.") (citations omitted); *Islam v. Miller*, 166 F.3d 1200 (table), No. 98-2080, 1998 WL 907692, at *3 (2d Cir. Dec. 23, 1998) (finding no *Faretta* inquiry necessary because defendant did not "clearly and unequivocally" waive his right to counsel and proceed *pro se* but, rather, participated in his defense *along with* his counsel); *United States v. Taylor*, 113 F.3d 1136, 1143 (10th Cir. 1997) (holding that because defendant made an articulable and unmistakable demand to proceed *pro se*, the trial court was obligated to ensure that the waiver of counsel was knowingly and intelligently made); *United States v. Leggett*, 81 F.3d 220, 224 (D.C. Cir. 1996) ("The law presumes that a defendant has not exercised his right to represent himself nor waived the right to counsel in the absence of an articulate and unmistakable demand by the defendant to proceed *pro se*."); *Stano v. Dugger*, 921 F.2d 1125, 1144 (11th Cir. 1991) ("The *Faretta* case law does not provide for proceeding pro se without assertion of the right to self-representation. There simply is no precedent in this circuit for proceeding pro se by constructive notice without an obvious assertion of the right to self-representation."); *see United States v. Frazier-El*, 204 F.3d 553, 558 (4th Cir. 2000) (stating that a request for self-representation must be clear and unequivocal); *United States v. Arlt*, 41 F.3d 516, 519 (9th Cir. 1994) (stating that the requirement of an unequivocal assertion of the right to proceed without counsel "protects against two unacceptable occurrences: an inadvertent waiver of the right to counsel by a defendant's 'occasional musings on the benefits of self-representation' and manipulation by the defendant of the mutually exclusive rights to counsel and self-representation" (quoting *Adams v. Carroll*, 875 F.2d 1441, 1444 (9th Cir. 1989))); *Robinson v. United States*, 897 F.2d 903, 907-08 (7th Cir. 1990) (finding simultaneous representation rather than partial waiver of counsel where defendant interrupted his attorney's summation at mid-point and concluded the summation *pro se*); *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir. 1990) ("In recognition of the thin line that a district court must traverse in evaluating demands to proceed pro se, and the knowledge that shrewd litigants can exploit this difficult constitutional area by making ambiguous self-representation claims to inject error into the record, this Court has required an individual to clearly and unequivocally assert the desire to represent himself.") (footnote omitted); *Bontempo v. Fenton*, 692 F.2d 954, 961 n.6 (3d Cir. 1982) (declining to find partial waiver of counsel where defendant presented to jury summation that was "supplemental to, and not in lieu of, retained counsel's closing to the jury"); *O'Reilly v. New York Times Co.*, 692 F.2d 863, 868 (2d Cir. 1982) (stating that, to claim the right to self-representation, a party must "clearly and unequivocally discharge any lawyer").

These courts have found that in the case of hybrid representation,[12] when a defendant desires to represent himself in part, the *Faretta* inquiry is only necessary once the defendant has made an "articulate and unmistakable demand" to proceed *pro se*. *Leggett*, 81 F.3d at 224. In *Leggett*, for example, the court found that the defendant never represented himself nor sought to do so but, rather, "merely sought and received the court's permission to supplement his counsel's examination and argument." *Id.* at 222. The defendant had informed the trial court that he was "not interested in representing [himself]" and was "not interested in taking the lead," but, rather, "want[ed] clarification as to whether" he could "interject certain

---

[12] It is well settled that there is no constitutional right to hybrid representation. *See Mosley*, 810 F.2d at 97-98; *see also McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) (noting that "*Faretta* does not require a trial judge to permit 'hybrid' representation" and "[a] defendant does not have a constitutional right to choreograph special appearances by counsel"). A district court may, however, exercise its discretion to permit a defendant to participate in his own defense without requiring the defendant thereafter to proceed without the assistance of counsel. *See Mosley*, 810 F.2d at 97-98.

questions." *Id.* at 225. The district court allowed Leggett to cross-examine three government witnesses, to pose questions to two defense witnesses, and to make a closing argument to the jury following the summation of his counsel. The D.C. Circuit noted that, by its own terms, "*Faretta* applies only where a defendant chooses to proceed *pro se* and thereby forgoes the benefits associated with the right to counsel." *Id.* at 224. Finding that the defendant had not made an unmistakable choice to proceed *pro se*, the court noted that "because the record shows that the hybrid procedure allowed by the district court responded to Leggett's concerns and to his stated preference that he be allowed to supplement his counsel's questions and argument, he has a heavy burden to show that the district court abused its discretion." *Id.* at 224.

In other cases, however, courts have held that in the instance of hybrid representation, *Faretta* warnings must be given any time the defendant assumes any of the "core functions" of counsel. *United States v. Davis*, 269 F.3d 514, 519-20 (5th Cir. 2001); *United States v. Turnbull*, 888 F.2d 636, 638 (9th Cir. 1989). In *Davis*, for example, the court allowed a hybrid arrangement whereby either the defendant or his counsel was required to be responsible for each witness:

> Of the nineteen witnesses examined by the defense at trial, Davis questioned fourteen. Fry [defense counsel] made objections to the Government's questioning of one witness; responded to offers of government exhibits; assisted Davis in making a proffer of a witness's potential testimony; and moved for acquittal after the Government rested, but not at the close of all the evidence. Both Davis and Fry gave closing arguments.

*Davis*, 269 F.3d at 517. The court found that, "'[h]ybrid' or not, the representation sought by Davis entailed a waiver of his Sixth Amendment right to counsel that required the safeguards specified in *Faretta*." *Id.* at 520. The court implied that defense counsel had acted in the role of standby counsel and held that because the existence of such standby counsel does not satisfy the Sixth Amendment right to counsel, Davis had waived his right to counsel and the district court had erred by not ensuring that the waiver was knowing and intelligent. *Id.*

We agree that *Faretta* procedures are only required when a defendant has clearly and unequivocally asserted his right to proceed *pro se*, and we find this case to be factually comparable to the *Leggett* line of cases rather than to the *Davis* line of cases.[13] A defendant may assert either his right to counsel or his right to present his own defense. Because the assertion of the right to self-representation necessarily involves a waiver of the constitutional right to counsel, and given the importance of the right to counsel, we think the wisest course is to require a clear and unequivocal assertion of a defendant's right to self-representation before his right to counsel may be deemed waived. Requiring an articulate and unmistakable demand of the right to proceed *pro se* decreases the danger of a savvy defendant manipulating these two mutually exclusive rights to put the district court in a Catch-22. A defendant who seeks merely to supplement his counsel's representation, as Cromer did here, has failed to avail himself of his right to self-representation and thus failed to waive his right to the assistance of counsel. This case is readily distinguishable from cases in which a defendant assumes the whole of his representation part-way through trial or acts as co-counsel with full responsibility for certain witnesses. Here, Cromer did not waive his right to counsel because he continued to receive substantial assistance from counsel, even while he was actually questioning the witness. Because there was no waiver, clearly and unequivocally asserted, there was no need to warn Cromer about the consequences of that waiver.

---

[13]In *Wilson v. Hurt*, No. 00-3165, 2002 WL 197997, at *4-5 (6th Cir. Feb. 6, 2002), this Court, in an unreported decision, expressed its agreement with *Davis* and *Turnbull* rather than with *Leggett*. We note that *Wilson* does not represent binding precedent. Furthermore, *Wilson* is factually distinguishable from the case sub judice. There, the defendant had elected to proceed *pro se* in the middle of his trial. After the request, Wilson examined all of the remaining witnesses, testified in narrative form without the assistance of counsel, and delivered his own closing argument. Wilson's attorney remained at counsel table, but he appears to have acted only in an advisory capacity. While Wilson seems to have acted on his own during the entire second part of the trial, Cromer never actually acted without the assistance of counsel.

## III.  CONCLUSION

For the foregoing reasons, this matter is **REVERSED** and **REMANDED** for further proceedings in accordance with this opinion.