**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0388n.06
Filed: May 12, 2005

**Nos. 02-5828; 02-5872**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | |
| v. | ) | **ON APPEAL FROM THE UNITED** |
| | ) | **STATES DISTRICT COURT FOR** |
| NOE O. RAMIREZ, and VICTOR | ) | **THE EASTERN DISTRICT OF** |
| MEDELLIN, | ) | **TENNESSEE** |
| | ) | |
| **Defendants-Appellants.** | ) | |
| | ) | |
| | ) | |

BEFORE: KEITH, and CLAY, Circuit Judges; O'MEARA[*]

**DAMON J. KEITH, Circuit Judge.** Each of the Defendants, Noe O. Ramirez and Victor Medellin, appeals his conviction or sentence arising out of a multiple-count indictment in relation to a federal and state investigation of the organized distribution of cocaine and marijuana in the Eastern District of Tennessee. More specifically, Ramirez contends that the district court committed reversible error during the trial when it erroneously admitted testimonial hearsay by a government witness. In a separate appeal, Medellin initially argued that, in sentencing him for conspiracy, the district court failed to make specific findings of fact as to the amount of drugs directly attributable

_____

[*] The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

to him. As a result of *Blakely v. Washington*, 124 S.Ct. 2531 (2004), Medellin has supplemented his argument on this issue and now asserts that he had a right to have the jury, not the district court, make specific findings of fact as to the amount of drugs involved in the conspiracy that are directly attributable to him. For the reasons that have been set forth below, we AFFIRM both Ramirez's conviction and sentence and Medellin's sentence.

## I. BACKGROUND

The convictions in this case arose out of a joint investigation by the Tennessee Bureau of Investigation ("TBI") and the Federal Bureau of Investigation concerning the distribution of cocaine and marijuana by a large organization operating in three counties within the Eastern District of Tennessee. The primary supplier of illegal narcotics to the organization was Manrique Reynoso. Reynoso distributed cocaine and marijuana to Jaime Benitez, among others. Benitez, in turn, supplied these drugs to the Defendants, Ramirez and Medellin, as well as other distributors. In the course of the investigation, agents participated in at least fifty drug transactions and either seized or intercepted at least twelve kilograms of cocaine, 2500 pounds of marijuana, and over $330,000.00 in cash. When drug shipments arrived, they were divided and stored in "stash houses." Other houses, including Medellin's home, functioned as distribution points. Law enforcement agents surveilled the movement of drugs from these different locations. In addition, undercover agents and confidential informants followed and consummated drug deals with suspected suppliers and distributors. According to TBI Agent Jim Williams, during one of these transactions, Benitez told Williams that Benitez and his distributors (which included Ramirez and Medellin) sold one kilogram of cocaine every three days.

On June 15, 2001, agents executed nineteen search warrants and arrested thirty-seven defendants who were charged in three indictments. On September 25, 2001, a grand jury issued a forty-four count superseding indictment against Ramirez, Medellin, and seven other co-defendants. Ramirez, Medellin and two co-defendants were subsequently tried before a jury beginning on February 28, 2002. Approximately one week later, on March 6, 2002, all four individuals were convicted.

## A. Noe O. Ramirez's Case

Ramirez's involvement in this drug conspiracy includes, among other things, events that occurred on May 14, 2001, resulting in his arrest. On the basis of wiretapped conversations, investigating agents believed that Benitez and Ramirez were planning to transfer drugs from one location to another on that day. The agents set up surveillance at locations that had been designated as "stash houses," and observed a green car at one of these locations. A short while later, agents observed the same vehicle at a different stash house. When the vehicle departed the second stash house, surveillance agents requested the assistance of Deputy Chad Mullins of the Hamblen County Sheriff's Office in intercepting the car. Initiating his emergency lights, Deputy Mullins attempted to effect a traffic stop of the vehicle, but the driver refused to stop. A high-speed chase ensued, during which Deputy Mullins observed a package being thrown out of a window on the passenger's side of the vehicle. After the package was discarded, the vehicle traveled about one additional mile before the car stopped and its occupants scattered. All of the individuals were apprehended, including Ramirez, who was driving the vehicle at the time of the chase. Deputy Mullins also located the package that had been thrown from the vehicle, which was discovered to have contained three ounces of cocaine.

During the trial, several persons testified against Ramirez. Reynoso, the main supplier, described Ramirez as one of Benitez's assistants, who regularly accompanied Benitez when they came to pick up cocaine and marijuana. Reynoso was able to remember one specific occasion, in January or February 2000, when Benitez and Ramirez picked up one or two kilograms of cocaine and twenty pounds of marijuana. Reynoso also testified that Ramirez delivered money for Benitez. Reynoso believed that Ramirez was acting on behalf of Benitez.

Alejandro Hernandez, another indicted co-conspirator, testified that he sold one to two ounces of cocaine a day, which he ordered from Benitez. According to Hernandez, Ramirez often delivered the cocaine after he had ordered it from Benitez, and, in the event that he was unable to reach Benitez directly, Hernandez would call Ramirez directly for his cocaine supply. Hernandez testified that Ramirez delivered cocaine to him on thirty to forty occasions, and that he, Hernandez, had been to one of the stash houses to pick up his cocaine. In addition, Armando Dominguez, an indicted co-conspirator, testified that he sold six to nine ounces of cocaine each week, that he delivered cocaine to Benitez, and that he knew that Ramirez was selling cocaine for Benitez.

Over Ramirez's objection, Agent Kevin Keithley testified at trial that surveillance agents observed a green car at both of Benitez's stash houses on the morning of May 14, 2001. Agent Keithley, however, conceded that he did not witness the car himself.

On the basis of the above information, among other evidence, the jury convicted Ramirez on Counts 2 and 5 (distribution and possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1)) and Count 38 (possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2) of the superceding indictment.

Following his conviction, Ramirez filed a motion for a judgment of acquittal and for a new trial. The district court denied both of these motions.

### B. Victor Medellin's Case

For his part in the conspiracy, Medellin sold cocaine to Jim Williams, the undercover TBI agent, in three observed and recorded transactions. On July 18, 2000, during the first transaction, Agent Williams had planned to meet Alejandro Cortez, one of Medellin's co-defendants, at Medellin's house in order to purchase an ounce of cocaine. According to Williams, Cortez was not there when he arrived, so Medellin telephoned Cortez to inform him that Williams wanted an ounce of cocaine. Immediately following his conversation with Cortez, Medellin instructed Williams to go to Cedar Hill Road in Hamblen County, where he could purchase an ounce of cocaine from Cortez.

During the second transaction, on August 8, 2000, Williams again went to Medellin's home, where he expected to meet Cortez and to purchase two ounces of cocaine. After a short wait, Cortez and Medellin arrived together. Medellin instructed Cortez to take Williams to the back of the house to do the deal.

The third transaction occurred on August 14, 2000, when Williams called Cortez's cellular telephone and Benetiz answered. Williams placed an order for two ounces and was instructed to proceed to Medellin's home. When Williams arrived, Medellin was outside working on his truck. After waiting a while, Medellin went inside to call Benitez. After he was unable to reach Benitez, Medellin asked Williams how much cocaine he needed. In light of the fact that Williams had been waiting for quite some time, Medellin offered to sell him two ounces of cocaine on Benitez's behalf. Medellin stressed to Williams that he was still Cortez's customer. As Williams was leaving

Medellin's residence following this initial transaction, surveillance agents at Benitez's residence contacted Williams and notified him that Benitez was en route to Medellin's home. Williams then instructed a confidential informant accompanying him to telephone Benitez and tell him that they had not been able to wait and had gone ahead and purchased two ounces from Medellin, but that they needed another ounce. Benitez directed them to meet him at an Exxon station in Morristown, Tennessee, where Benitez later sold Williams another ounce. During this later recorded transaction, Benitez informed Williams that the cocaine he had purchased from Medellin and Cortez had come from him and that they both worked for him.

Cortez testified that he obtained, from Benitez, ounce packages of cocaine that he sold on a weekly basis. Cortez and Medellin were friends, and he believed that Medellin also obtained his cocaine from Benitez. Dominguez, who also testified against Ramirez, said that he knew that Medellin was one of several people who helped Benitez sell cocaine. Hernandez, another person who testified against both Ramirez and Medellin, admitted that he purchased cocaine from Medellin on two occasions. On both occasions, Hernandez purchased from Medellin because Benitez was out of cocaine.

Reynoso identified Medellin as one of those individuals who sometimes accompanied Benitez when he came to pick up cocaine. Medellin also came several times on his own to get cocaine and marijuana, receiving one ounce of cocaine, and usually between five and nine ounces of marijuana. Reynoso did not know Medellin's customers and never witnessed him sell drugs.

The jury convicted Medellin on Count 5 (distribution and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1)), Count 14 (use of a telephone to facilitate the distribution of a controlled substance in violation of 21 U.S.C. § 843(b)), Counts 15 and 20

(distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) & § 841(b)(1)(C)), and Count 19 (aiding and abetting the distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 18 U.S.C. §2). After he was found guilty, Medellin filed a motion for a judgment of acquittal and for a new trial. The district court denied both of these motions.

## C. Sentencing

Following the issuance of his respective Presentence Investigation Report ("PSR"), Ramirez and Medellin each filed separate objections to the PSR.[1] Medellin objected to his PSR, questioning the quantity of cocaine attributed to his involvement in the conspiracy. The Probation Officer responded that the quantity of cocaine reflected in the PSR was based upon the jury's verdict convicting Medellin of conspiracy to distribute over five kilograms of cocaine. At the sentencing hearing, the district court gave Medellin an opportunity to reassert his objection regarding the amount of cocaine properly attributable to him. After the government argued against the objection, however, counsel for Medellin conceded that "there [was] no need for an evidentiary hearing. . . . [W]e ask the court to sentence him at the low end of the range of 121 months." Joint Appendix ("J.A.") at 165-66.

On June 10, 2002, the district court sentenced Medellin to 121 months on Counts 5, 15, 19, and 20, and 48 months on Count 14, to be served concurrently. On June 17, 2002, the district court sentenced Ramirez to 121 months on Counts 2, 5, and 38, to be served concurrently. The Defendants timely filed separate appeals.

## II. DISCUSSION

---

[1] Ramirez's objections are not at issue in this appeal.

In appealing his conviction and sentence, Ramirez asserts the district court erred by failing to exclude testimonial hearsay by Agent Keithley. Medellin, however, contests only his sentence for conspiracy, which he contends violated his constitutional rights because it was not based upon specific factual findings that the entire amount of drugs alleged in the conspiracy was properly attributable to him. We address each of these arguments in turn.

### A. Ramirez's Appeal

Ramirez asserts that: (1) the testimony of Agent Keithley was hearsay; (2) the testimony was admitted over the objection of the defendant; (3) the United States did not urge at the time of the objection that such evidence was only for background; (4) the district court gave no limiting instruction; and (5) under such circumstances, the admission of this testimony violated Federal Rule of Evidence 802 and the Sixth Amendment to the United States Constitution. The government argues, in response, that Agent Keithley's representations at trial do not constitute hearsay in that he submitted the contested information merely as background information to set the scene of the incident that led to Ramirez's arrest. In addition, the government contends that the admission of the contested statements amounts to, at best, harmless error in light of the other evidence submitted against Ramirez.

We review the district court's evidentiary decisions for an abuse of discretion and "only reverse when such abuse of discretion has caused more than harmless error." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, when it improperly applies the law, or when it employs an erroneous legal standard." *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004).

Ramirez correctly asserts that testimonial hearsay that places him at the scene of known drug stash houses is barred by the Sixth Amendment absent a showing that the declarant was unavailable and that Ramirez had a prior opportunity to cross-examine. The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In addressing the Confrontation Clause, the Supreme Court recently held that where testimonial hearsay is at issue, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 124 S.Ct. 1354, 1374 (2004).

In this case, Ramirez objected to Agent Keithley's trial testimony during the following exchange:

Government: And you were part of that [May 14, 2001,] surveillance?
Keithley: Yes, I was.
Government: And did you see anyone in particular that day?
Keithley: I myself did not, but other surveilling agents did.
Government: And did that surveillance result in the traffic stop of Garcia, Rubio Cruz and Mr. Ramirez?
Keithley: Yes, it did.
Government: And were they surveilled at Roddy Drive that day?
Ramirez: Objection. Your Honor, this officer has testified that he didn't see them there.
The Court: Well, you have to pick it up on - - what's the question that you're objecting to?
Government: My question, your Honor, was were they surveilled at the Roddy Drive address.
Ramirez: In other words, did somebody see them there. He said he didn't.
The Court: Well, let him answer what the question is, and we'll find out. I don't know what's coming, it's a proper question. What's the answer?
Keithley: Surveilling agents identified a green four-door vehicle at Sartain Springs Road on May 14, at 2001 in the morning. That same vehicle was later identified at Roddy Drive later on that morning. At approximately 11:00 a.m. surveilling agents identified that same green vehicle leaving the Roddy Drive residence, and then the traffic stop ensued after a fairly lengthy pursuit.
Ramirez: Your Honor, again I would object and move to strike that testimony.

The Court:      Okay.  Let the record show that he has made it.

Upon our examination of the above exchange, we agree with Ramirez that Agent Keithley's testimony was hearsay.[2]  Agent Keithley conceded that at the time of the surveillance, he did not see Ramirez at the stash houses.  Rather, he asserted, other surveilling agents were present and they identified Ramirez at those locations.  Therefore, Agent Keithley is relating an out of court statement from other surveilling agents.  Furthermore, the out of court statement was offered to prove the truth of the matter asserted, that the vehicle that Ramirez was driving was identified at two different stash houses on the morning of the day he was apprehended.

Moreover, applying the standard announced by this court in *United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004), we also conclude that Agent Keithley's statements were testimonial in nature.  While in *Crawford* the Supreme Court declined to "spell out a comprehensive definition of 'testimonial,'" 124 S.Ct. at 1374, this court determined in *Cromer* that the proper inquiry is "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime," 389 F.3d at 675.  Applying the *Cromer* standard, we have no doubt that the surveillance agent(s) who informed Keithley that Ramirez's vehicle had been identified at the stash houses did so with the anticipation that the statements would be used against Ramirez in the investigation.  Thus, we conclude that the out of court statement made by the surveillance agents constituted testimonial hearsay that was admitted into evidence through Agent Keithley.

---

[2] We recognize that in objecting to Agent Keithley's testimony Ramirez did not specifically use the term "hearsay," but in light of the full context of the exchange during trial, we conclude that it was plainly evident that the basis of his objection was for hearsay purposes.

Although we find the district court's introduction of Keithley's testimonial hearsay violated *Crawford* because there was no showing that the declarant(s) was unavailable and Ramirez did not have a prior opportunity to cross-examine the declarant(s), we nonetheless agree with the government that the admission of this testimony was harmless. "We will vacate a jury's verdict based on a district court's erroneous admission of hearsay evidence only if the testimony's admission amounted to more than harmless error." *Field v. Trigg County Hosp., Inc.*, 386 F.3d 729, 736 (6th Cir. 2004); *see United States v. Trujillo*, 376 F.3d 593, 611 (6th Cir. 2004) (concluding that "the district court's admission of the hearsay statements constituted harmless error"). In applying the harmless error standard, we will reverse if we "lack[] a 'fair assurance' that the outcome of a trial was not affected by evidentiary error." *Beck v. Haik*, 377 F.3d 624, 635 (6th Cir. 2004).

In the present case, Ramirez was convicted of two counts of conspiracy to possess with intent to distribute a controlled substance and one count of possession with intent to distribute a controlled substance on May 14, 2001. Deputy Mullins testified that when he attempted to effect the traffic stop, the vehicle pulled off to the right shoulder, slowed down but never stopped and then took off again traveling approximately eight to ten miles before pulling over into a yard. After the occupants exited the vehicle, a back-up officer caught and restrained the passenger, while Deputy Mullins cuffed the driver, who he identified as Ramirez. Deputy Mullins further testified that he observed the occupants of the vehicle discard a package out of the passenger-side window during his pursuit. Once he secured Ramirez, he returned to the location where the package had been discarded and retrieved it. The package contained three ounces of cocaine.

In addition to the testimony of Deputy Mullins, several of Ramirez's co-conspirators testified against him. Reynoso described him as one of Benitez's assistants, testified that he delivered money

for Benitez, and specifically recounted that he accompanied Benitez to pick up one or two kilograms of cocaine and twenty pounds of marijuana in January or February 2000. Hernandez testified that Ramirez often delivered cocaine to him, and had done so on thirty to forty occasions.

In light of the other overwhelming evidence against Ramirez, we conclude that the erroneously admitted hearsay evidence did not affect the outcome of his case. The contested testimonial hearsay of Agent Keithley merely places Ramirez at two stash houses on the day of his arrest. The significance of this testimony pales in comparison to the other substantial evidence introduced against Ramirez at trial. Accordingly, we find the district court's admission constituted a mere harmless error and we affirm Ramirez's conviction and sentence.

### B. Medellin's Appeal

In his appeal, Medellin argues that he should be sentenced only for the quantity of cocaine that he personally sold to undercover agents. He initially contended that the district court failed to conduct a foreseeability analysis in determining the drug amounts for which he should be held responsible for purposes of sentencing. In light of the Supreme Court's decision in *Blakely v. Washington*, 124 S.Ct. 2531 (2004), Medellin now submits that such a foreseeability analysis would have to be conducted by a jury under a beyond-a-reasonable-doubt standard. In the aftermath of *United States v. Booker*, 125 S.Ct. 738 (2005), we agree with Medellin's general argument that a defendant's sentence must be based upon facts either found by a jury or to which he concedes. We, however, need not dwell long upon Medellin's complaint in this case because our review of the record reveals that he was charged in the indictment, found guilty by the jury, and sentenced by the district court for having conspired to distribute five kilograms or more of cocaine.

In his brief, Medellin argues that "while the conspiracy in this case might have involved five or more kilograms of cocaine, the trial evidence and the Presentence Report filed in this case only connected [him] to 429.8 grams of cocaine." Appellant Medellin's Br. at 13. Medellin further asserted in his brief that the sentencing guidelines required the district court to make "particularized findings" that he could foresee the other drug amounts involved in the conspiracy. *Id*. at 14. In a letter of July 19, 2004, Medellin supplemented his earlier argument and now contends that pursuant to *Blakely* the foreseeability analysis formerly conducted by the district court would now "have to have been conducted by a jury operating under a reasonable doubt standard."

We need not explore the legal underpinnings of Medellin's argument. For even if we agree with his claim, the application of those principles to this case does not advance his cause on appeal. First, the indictment charged Medellin with having conspired to "distribute 5 kilograms or more of . . . cocaine." J.A. at 72. Second, the district court properly instructed the jury that it was required to find that the amount of cocaine alleged in the indictment was attributable to each of the defendants, including Medellin. Specifically, the district court instructed the jury that counts five, six, and seven of the indictment were alternative counts, and "[c]ount [f]ive alleges a conspiracy involving five kilograms of cocaine." *Id*. at 600. The district court also charged the jury that the government must prove that the defendants (1) knowingly and voluntarily, (2) conspired to distribute cocaine. Importantly in this appeal, the court directed that the jury "must apply this test to each of the defendants *separately*." *Id*. at 602 (emphasis added). Lastly, the district court set the following parameters with regard to the conspiracy charges: "all members of a conspiracy are responsible for the acts committed by other members, as long as they are within the reasonable foreseeable scope of the agreement," and "no defendant is responsible for the acts of others that go beyond the fair

scope of the agreement as he understood it." *Id*. at 605. Subsequently, the jury convicted Medellin on count five of the indictment, and the district court sentenced him to a term of imprisonment of 121 months.

There is no dispute that the district court sentenced Medellin within the applicable guideline range for possession with the intent to distribute at least five kilograms, but less than 15 kilograms of cocaine. Inasmuch as the indictment charged Medellin with having conspired to distribute five kilograms or more of cocaine, the district court instructed the jury that he was responsible only for those acts of the conspiracy that were reasonably foreseeable to him, the jury convicted Medellin of participating in the conspiracy, and the district court sentenced him within the applicable guideline range, this court finds that Medellin's asserted error is without merit.

Finally, we note that Medellin has not argued pursuant to *United States v. Booker*, 125 S.Ct. 738 (2005), that he is entitled to resentencing by virtue of the fact that the sentencing guidelines are no longer mandatory. In *United States v. Murdock*, 398 F.3d 491, 502 (6th Cir. 2005), this court declined to consider such an argument where the defendant has failed to raise it.

### III. CONCLUSION

For the reasons stated above, we AFFIRM Ramirez's conviction and sentence and Medellin's sentence.