**NOT FOR FULL-TEXT PUBLICATION**
File Name: 06a0312n.06
Filed: May 4, 2006

**NO. 05-3239**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

                                 **ON APPEAL FROM THE**

v.                                **UNITED STATES DISTRICT**

                                   **COURT FOR THE NORTHERN**

THEODORE WILLIAM JACKSON,    **DISTRICT OF OHIO**

      Defendant-Appellant.

_____/

**BEFORE:**    SUHRHEINRICH, ROGERS and COOK, Circuit Judges.

      **SUHRHEINRICH, Circuit Judge.**  Defendant Theodore William Jackson appeals from the judgment of conviction and sentence imposed following his criminal trial on bank robbery charges. For the following reasons, we **AFFIRM.**

**I. Background**

      On February 6, 2004, two men wearing ski masks and carrying handguns robbed the National City Bank at 285 Babbit Road in Euclid, Ohio. Co-defendant Walter R. Grant jumped the teller counter and took monies out of the teller drawers of two female tellers. While Grant was gathering the money, Defendant Jackson stood by the rear door, and ordered everyone to get down on the floor. Jackson and Grant fled the scene in a vehicle that they abandoned a short time later. Police officers dispatched to the scene noticed Jackson walking down the street and observed that he "attempted to be pre-occupied by counting some money." Jackson was taken into custody. A pat down search of Jackson revealed 13 rounds of 9mm ammunition. Jackson denied having committed

the bank robbery. Grant, who took off in a different direction on foot once they fled the car, was apprehended as he attempted to hide in the bushes. Grant had with him in a bag a loaded 9mm pistol and monies from the robbery, and admitted his involvement in the robbery to the arresting officers. Jackson and Grant were taken back to the bank. At the bank, Grant positively identified Jackson as his partner in the robbery. At this point, Jackson was formally placed under arrest.

On February 13, 2004, Jackson and Grant each appeared before the magistrate judge pursuant to a complaint filed on February 9, 2004. Donald Butler, Esq., was appointed to represent Jackson. After a detention hearing held on February 19, 2004, Jackson was ordered detained. On February 23, 2004, Butler filed a motion for a mental competency examination to determine whether Jackson was sane at the time of the offense. On February 27, 2004, the magistrate judge granted counsel's unopposed motion. Jackson and co-defendant Grant were indicted on March 3, 2004. Thereafter, a psychiatric evaluation was completed.

Jackson was arraigned on August 10, 2004. The district court adopted the Forensic Report's finding that Jackson was competent to stand trial. Jackson did not object. During the arraignment proceedings, Butler informed the court that Jackson did not want Butler representing him "inasmuch as we are going to have a communication issue." Jackson asked the court to substitute a member of the Public Defenders Office. The court informed Jackson that the Federal Public Defenders Office could not represent both him and co-defendant Grant. The court praised Butler, and Jackson eventually agreed to cooperate with Butler.

Thereafter, Jackson filed pro se a number of handwritten motions basically accusing police and the government of withholding and/or destroying exculpatory evidence and of fabricating

damaging evidence against him. Jackson also claimed that he was entitled to conduct pretrial depositions of all "government prosecutor witnesses."

On October 13, 2004, Jackson moved the court to appoint "stand by counsel" and to allow him to proceed pro se. On November 10, 2004, the government filed a motion for determination of Defendant's pro se status. On November 12, 2004, at a pretrial conference, Butler told that court that Jackson wanted to represent himself, but wanted Butler as standby counsel. The district court instructed the government to outline for Jackson the penalties he faced and explained to him the pitfalls of self-representation. The district court deferred ruling on the motion, suggesting to Jackson that Butler, an experienced trial attorney, was in a better position to represent Jackson's interests.

On December 3, 2004, the district court held an evidentiary hearing on Jackson's motion to suppress, filed by defense counsel. Butler argued the motion and cross-examined the witnesses. The district court ruled that "there was at least reasonable suspicion to stop, detain and pat [Jackson] down."

Before trial began on December 6, 2004, the district court, on December 3, 2004, revisited the issue of self-representation. Jackson told the court he wanted Butler to represent him. Butler tried the case without objection from Jackson.

At trial, the government presented testimony from witnesses to the robbery and the police officers who responded to the robbery and collected the physical evidence. The government also presented the testimony of co-defendant Grant, who testified that Jackson had recruited him for the robbery, supplied the ski masks and the handguns used in the robbery, loaded the firearms with bullets, entered the bank with Grant, and escaped with him in the stolen getaway car. The government also introduced scientific evidence, including DNA analysis and hair fiber comparison

linking Jackson to a ski cap and gloves recovered from the getaway car. Bank surveillance photos were also introduced.

Jackson also testified, denying any involvement or acquaintance with Grant.

The jury returned guilty verdicts on all three counts. Jackson was sentenced to a total period of imprisonment of 360 months on February 15, 2005. Alan C. Rossman, Esq., was appointed to represent Jackson on appeal. He filed a timely notice of appeal on February 22, 2005.

## II. Analysis[1]

### A. Self-Representation

In his first two issues on appeal, Jackson claims that the district court violated his constitutional right to self-representation. The Supreme Court has held that a defendant has the right under the Sixth Amendment to waive counsel and represent himself. *Faretta v. California*, 422 U.S. 806 (1975) (holding that state court violated that right by forcing counsel upon the defendant after he had exercised the right). Thus, a criminal defendant has the right to "conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol." *McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984).

By exercising his constitutional right to present his own defense, a defendant necessarily waives his constitutional right to be represented by counsel. *Faretta*, 422 U.S. at 834; *United States v. Cromer*, 389 F.3d 662, 680 (6th Cir. 2004); *United States v. Mosley*, 810 F.2d 93, 97 (6th Cir. 1987) ("The right to defend *pro se* and the right to counsel have been aptly described as two faces

---

[1]Jackson presented seven issues in his brief. They are discussed in the relevant categories presented in the analysis.

of the same coin, in that waiver of one right constitutes a correlative assertion of the other.")
(internal quotation marks and citation omitted).  For this reason, an individual seeking to waive these
important benefits by representing himself must waive the right to counsel "knowingly and
intelligently" on the record.  *Faretta*, 422 U.S. at 835.

Thus, before finding that a defendant knowingly and voluntarily waived counsel, a trial court
must inform the defendant of the "dangers and disadvantages of self-representation, so that the
record will establish that he knows what he is doing and his choice is made with eyes open."
*Faretta*, 422 U.S. at 835 (internal quotation marks and citation omitted).  Pursuant to this directive
in *Faretta*, this Circuit has adopted the model inquiry set forth in 1 *Bench Book for United States
District Judges* 1.02-2 to -5 (3d ed. 1986), as a guide, which "identif[ies] the nature of the inquiry
to be made and the procedure to be followed henceforth in situations where an accused seeks to
waive representation by counsel and proceed pro se." *United States v. McDowell*, 814 F.2d 245, 250
(6th Cir. 1987); *Cromer*, 389 F.3d at 680; *see also McDowell*, 814 F.2d at 251-52 (setting forth a
list of questions designed to ascertain the defendant's familiarity with the law, to warn the defendant
of the gravity of the charges and the dangers of self-representation, and to determine whether the
defendant's decision to waive counsel is voluntary).

The Bench Book recommends that a district court advise a defendant against self-
representation in the following manner:

> I must advise you that in my opinion you would be far better defended by a
> trained lawyer than you can be by yourself.  I think it is unwise of you to try to
> represent yourself.  You are not familiar with the law.  You are not familiar with
> court procedure.  You are not familiar with the rules of evidence.  I would strongly
> urge you not to try to represent yourself.
>
> Now, in light of the penalty that you might suffer if you are found guilty and
> in light of all of the difficulties of representing yourself, is it still your desire to

represent yourself and to give up your right to be represented by a lawyer? Is your decision entirely voluntary on your part?

*McDowell*, 814 F.2d at 251-52 (headings omitted). If the defendant answers these two questions in the affirmative, and the district court believes that the waiver is knowing and voluntary, *McDowell* recommends that it should make a finding on the record similar to the following: "I find that the defendant has knowingly and voluntarily waived his right to counsel. I will therefore permit him to represent himself." *Id.* at 252. Substantial compliance with the list of questions will suffice. *Cromer*, 389 F.3d at 680 (citing *United States v. Miller*, 910 F.2d 1321, 1324 (6th Cir. 1990); and *United States v. Grosshans*, 821 F.2d 1247, 1250-51 (6th Cir. 1987)). A district court cannot deny a defendant's right to self-representation merely because the defendant lacks "technical legal knowledge." *Godinez v. Moran*, 509 U.S. 389, 399-400 (1993).

Jackson claims that he consistently asked to represent himself on numerous occasions prior to trial. He claims that the district court impermissibly vouched for Butler in an attempt to dissuade Jackson from exercising his constitutional right to self-representation, failed to adequately advise him regarding the right of self- representation, and improperly refused his unequivocal request to proceed pro se.

The record refutes Jackson's claims. Jackson did not unequivocally assert his right to self-representation prior to the filing of his "Motion for Pre [sic] Se Indigent" on October 13, 2004. Although Jackson expressed dissatisfaction with his attorney prior to that time, he did not assert the right to self-representation. At the August 10, 2004 arraignment, Jackson asked the court to appoint him another attorney. Such a request is not tantamount to a request to self-represent. *See United States v.Martin*, 25 F.3d 293, 296 (6th Cir. 1994) (stating that the mere expression of dissatisfaction with trial court's performance is not an appeal and would not be interpreted as a motion to proceed

pro se, but instead would be understood as an appeal to the trial court's discretion to substitute counsel). On September 1, 2004, during the pretrial conference held in open court, and again on September 24, 2004, also a pretrial conference on the record, Jackson was allowed to address the court. At no point did he ask to exercise his right of self-representation. At the September 24 conference, Jackson did request access to a law library. However, like the request for another lawyer, such a statement is not an unequivocal assertion for self-representation. *Cf. id.*, 25 F.3d at 296 (dissatisfaction with trial counsel's performance is not tantamount to a request to exercise the right of self-representation).

Furthermore, at this point in the proceedings, the district court had been alerted by the Forensic Report to the fact that Jackson distrusted others, particularly authority figures and the legal system. Given the trial court's responsibility to counsel against self-representation, the district court's comments encouraging communication between Jackson and counsel at this early point in the proceedings when Jackson had not yet asserted a right to self-representation, were not improper. *Cf. id.* (holding that the trial court is not required to notify the defendant of her right of self-representation).

The government concedes that Jackson unequivocally asserted his right to represent himself on October 13, 2004, upon his filing of the Motion for Pre [sic] Se Indigent. Upon the government's request, the district court addressed the motion during the November 12, 2004 pretrial conference. At that time, the district court explained the possible penalties Jackson faced if convicted, and informed him of the dangers of self-representation, including the fact that he would be required to follow the Federal Rules of Evidence and that the court would not be able to assist him. The court inquired as to Jackson's education and experience with the criminal justice system. Thus, the

-7-

district court substantially complied with the *McDowell* inquiry. Moreover, the court "rigorously conveyed" the pitfalls of self-representation. *See Patterson v. Illinois*, 487 U.S. 285, 298 (1988) (stating that warnings of the pitfalls of proceeding pro se must be rigorously conveyed, but clarifying that at earlier stages in the criminal process, a less formal colloquy may suffice).

Although the district court did not finalize the inquiry by asking whether Jackson was prepared to and capable of knowingly and voluntarily waiving his right to counsel, the court was sidetracked by Jackson's statements regarding matters of evidence, discovery, prior convictions, and a conspiracy theory. Thus, the district court prudently deferred ruling on Jackson's motion, informing Jackson that "I'm not in a position now to grant your request to represent yourself," and that "I may change that."[2] The court added:

> My suggestion at this time is that Mr. Butler, with 30 years of experience as being a trial lawyer, probably would be in a better position to represent your interests than you would be, but I have an open mind about it. So otherwise we will see you on November 30th.

Thus, the court did not revoke Jackson's right to represent himself at this time, and did in fact defer ruling on Jackson's request to proceed pro se at the time of the November 12 *McDowell* inquiry.

Then, on December 6, 2004, before jury selection, the district court asked Jackson,

---

[2]Our opinion should not be read as general approval of a district court's deferring its ruling on a motion for self representation. A district court should rule on a motion for self representation as soon as practicable. In some cases, a defendant may feel compelled to accept representation if the district court delays ruling on the motion until the eve or day of trial because the defendant will have little or no time to prepare. In this case, however, Jackson's statements at the hearing concerned discovery, evidentiary, and conspiracy issues, rendering it unclear whether Jackson was still seeking to represent himself. Moreover, at the December 3rd hearing, Jackson in no way indicated that he felt compelled to accept representation. Instead, he stated that he wanted representation by Mr. Butler "to the fullest."

-8-

THE COURT: Okay. We have a question of you representing yourself, Theodore.

What's your thought about that?

To which Jackson responded:

[JACKSON]: The only thing I'm asking Mr. Butler to do is represent me to the fullest. I apologize.

Thus, the record does not support Jackson's assertion that he consistently asserted his right to self-representation. Jackson's vacillation continued during trial. During the government's case-in-chief, the court allowed Jackson to cross-examine Officer Doyle. Specifically, Jackson stated, "I would like to represent myself right now, point, period. He's not asking the questions I need to ask. This man is up here smiling and so I would like to represent myself with assistance by counsel." Upon conclusion of his cross-examination of Doyle, Jackson then stated: "I'm sure Mr. Butler has some questions to ask because a couple things I missed but I had to defend myself." Jackson's statements clearly indicate that he wished for Butler to serve as his trial counsel for the remainder of the trial, and therefore as a relinquishment of his right to self-representation, with the exception of limited hybrid representation permitted by the district court. Finally, the district court's decision to allow Jackson to conduct the cross-examination of Doyle reinforces the conclusion that the court had not reached a final decision on the motion to proceed pro se at the November 12 proceedings, and that it was Jackson who made the ultimate decision to be represented by counsel at trial.

In short, Jackson's contention that he was denied his constitutional right to exercise his right to self-representation is rejected.

**B. Suppression of Evidence**

-9-

Jackson argues that the district court erred in determining that his stop and frisk was based on reasonable suspicion. He therefore contends that the district erred in denying his motion to suppress the ammunition recovered as a result of the *Terry* stop and frisk. In reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). We consider the evidence in the light most favorable to the government. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc).

It is well-settled that a law enforcement officer may stop and briefly detain an individual the officer reasonably suspects is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30 (1968) (holding that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot" the officer may briefly stop the individual and make "reasonable inquiries" to confirm or dispel his suspicions). "Reasonable suspicion" to justify an investigative stop is evaluated by the "totality of the circumstances." *United States v. Sokolow*, 490 U.S. 1, 8 (1989). The facts and circumstances known to the officer at the time are to be "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418 (1981).

The district court did not err in denying Jackson's motion to suppress the pouch of ammunition. At the suppression hearing, Officer Caruso of the Euclid Police Department testified that at 12:50 p.m. on February 6, 2004, he received a call through dispatch regarding a bank robbery that occurred at 285 Babbitt Road in Euclid, Ohio. The call indicated that the bank had been robbed at gunpoint, by two black males wearing white and black clothing, who had fled in a four-door

brown vehicle. Caruso, who was traveling westbound on Lakeshore Boulevard, observed a four-door vehicle occupied by two black men in white and black clothing traveling in the opposite direction. Caruso, with his lights on and siren activated, made a U-turn. He saw the vehicle make a sharp right turn from the left lane, and turn southbound onto East 238th Street. At this point the vehicle stopped, and the passengers fled, one to the east and the other in a westerly direction. Caruso used his police radio to notify other responding officers of the suspects' activities as they were occurring.

Officer Paul Doyle, then a thirteen-year veteran of the Euclid Police Department, testified that he heard the initial broadcast as well as Caruso's, and pulled his marked patrol car onto East 235th Street, the next street west of East 238th Street. Doyle stated that other officers south of his position canvassed on foot, and told him that they had not encountered the west-bound suspect.

Doyle continued that about five minutes after he heard Caruso's report, he observed an African-American male, who turned out to be Jackson, walking towards him, and away from the location of the getaway car. Doyle stated that Jackson was counting money, holding "his hands up high in front of his face," and that he "appeared to make an exaggerated gesture to be counting money." Doyle noted that he appeared to be counting just a few bills, over and over again. This struck Doyle as "suspicious or unusual" in that Jackson "seemed to have a heightened awareness of my presence but . . . seemed to be preoccupying himself with the bills, like he didn't want to be noticed." Doyle stated that as he counted and recounted the bills, Jackson looked over at Doyle. Doyle said that Jackson was "nervous." Doyle testified that Jackson looked "panicked" when he detected Doyle and seemed to be looking for a place to run.

Doyle testified that approximately five minutes had lapsed between the time he heard Caruso's broadcast and the time he first saw Jackson.

At this point, Doyle got out of the patrol car, drew his weapon, and ordered Jackson to the ground. Doyle had to force Jackson to the ground, where he held him at gunpoint. Doyle said that at this point, he had formed a belief that Jackson was a bank robbery suspect, based on the information he had received. Doyle waited for back-up until Officer Chad Daubenmire arrived a minute later. Daubenmire handcuffed Jackson and conducted a pat-down of his outer garments for weapons. In the area of Jackson's right front pants pocket, Daubenmire "felt something hard" that "felt like it was ammunition." Daubenmire then removed a pouch containing thirteen rounds of 9mm ammunition. Daubenmire also retrieved identification documents from Jackson's back pocket. They reflected the name "Melvin Tate," and looked nothing like Jackson.

Meanwhile other officers located clothing in the bushes approximately "a hundred feet away," including a dark hooded sweatshirt and a pair of white jeans in which a Ruger magazine with additional rounds of 9mm ammunition was found. Also during this time Doyle learned that the other suspect had been apprehended and had admitted his involvement to the arresting officers.

The facts known to Doyle at the time of the stop satisfy the reasonable suspicion standard. Doyle knew that a bank had just been robbed by two armed black men who fled the scene in a four-door vehicle. Doyle knew that Caruso had seen a car matching that description and had observed two men fleeing from it, within 200 yards of Doyle's location. He also knew that one of the suspects was running towards his position on East 235th Street. Doyle arrived within seconds of Caruso's broadcast. Doyle saw no one other than Jackson. Jackson's behavior was odd. Doyle's observations as an experienced patrol officer, as well as the surrounding circumstances, constitute

-12-

"specific and articulable" facts supporting a reasonable suspicion that Jackson had committed the robbery. The district court did not err in concluding that a *Terry* stop was warranted by the circumstances.

Jackson further argues that the investigative methods utilized by the police officers were constitutionally unreasonable. Jackson did not present this argument below, but merely challenged the seizure of the ammunition on the ground that the stop was not supported by reasonable suspicion. We review forfeited errors under the Federal Rule of Civil Procedure 52(b) plain error standard. *See Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (articulating the plain error standard as an error, that is plain and affects substantial rights, and further seriously affects the fairness or integrity of judicial proceedings).

When determining whether a detention not supported by probable cause was reasonable, the government must prove that the detention and investigative methods used were reasonable under the circumstances. *United States v. Jacob*, 377 F.3d 573, 578 (6th Cir. 2004), *cert. denied*, 543 U.S. 1171 (2005). The degree of force utilized by the officers during a detention must be reasonably related to the scope of the situation before them. *Id.* (citations omitted). "This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop." *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001).

Here, the officers' use of force was reasonable under the circumstances under any standard of review. At the time Doyle approached Jackson, he was without backup, and he knew that less than ten minutes prior two suspects had committed armed bank robbery several blocks away. Furthermore, the individual appeared nervous. Under these circumstances, Doyle was entitled to take measures to protect himself, including drawing his firearm, and ordering and holding Jackson

to the ground. *See, e.g.*, *Heath*, 259 F.3d at 529-30 (holding that officers' conduct in effectuating investigative stop was reasonable even though they blocked the suspect's vehicle, emerged with weapons drawn, pulled the suspect from his vehicle and frisked and handcuffed him, where the individual was reasonably suspected of carrying drugs); *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814-15 (6th Cir. 1999) (holding that investigative stop did not ripen into arrest even though the suspects were removed from their vehicle, at gunpoint, handcuffed, placed in a police cruiser and detained for twenty minutes where the officers reasonably albeit mistakenly believed they had been involved in a serious violent crime).

Further, once backup arrived, the officers were authorized to conduct a patdown search for weapons. As the *Terry* court held, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others," the officer is entitled to conduct a patdown search "to determine whether the person is in fact carrying a weapon." *Terry*, 392 U.S. at 24; *see also Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993).

Jackson further argues that Doyle's stop evolved into an illegal arrest by the fact that he was held for at least twenty minutes and transported back to the bank. The government "agrees that a plausible argument can be made that Jackson was arrested for Fourth Amendment purposes sometime before the decision was made, at the bank following Grant's identification, to formally place Jackson under arrest." However, the government asserts that there were facts in addition to those supporting the initial stop which amounted to probable cause. These facts included Jackson's refusal to identify himself; the retrieval of 9mm ammunition and false identification from his person; the recovery of the clothing from the nearby bushes containing 9mm ammunition and a 9mm

magazine; and the apprehension of Grant a short distance away, who was in possession of a loaded 9mm pistol, a 9mm magazine, and proceeds from the robbery. Although as Jackson points out, the record does not reflect exactly when the clothing was discovered or when Grant was apprehended, the discovery of the ammunition and false identification, which occurred within a minute of Jackson's stop, provided at a minimum a basis for continued investigative detention. Shortly after that Doyle learned of the clothing and of Grant's apprehension. All of these events took less than twenty-eight minutes. It is certainly arguable that probable cause existed at this point anyway.

In any event, as the government points out, the record establishes that the frisk and resulting seizure of ammunition from Jackson's person occurred "as soon as Officer Daubenmire arrived on the scene," which was approximately one minute after Doyle initiated the stop. Thus, the seizure of the ammunition was authorized under *Terry* and is independent of a search incident to arrest. In other words, even if the arrest were not supported by probable cause, the ammunition was lawfully seized under *Terry*. *Cf. United States v. Bentley*, 29 F.3d 1073, 1075-76 (6th Cir. 1994) (holding that the premature arrest of the defendant without probable cause did not require suppression of evidence of firearms found during the search of the defendant's van, since they were validly seized under the plain view doctrine rather than as a search incident to arrest).

Jackson also complains that the seizure of ammunition was unconstitutional because Daubenmire's patdown was not confined to a search for weapons, as required by *Terry*. The record belies this assertion. Daubenmire testified that while patting down Jackson's outer garments he felt in Jackson's pocket "something hard" which "felt like ammunition to me." Although Daubenmire acknowledged that he did not believe the object to be a gun, when asked if he felt anything that "caused him concern," Daubenmire responded, "I thought ammunition was in his right front pocket."

Daubenmire further stated that at the time he removed the ammunition pouch, he had not yet completed the patdown. Daubenmire's removal of the ammunition pouch, before he had completed the frisk to exclude the possibility that Jackson also had a gun on him, was reasonable. The seizure of the ammunition was also reasonable under *Dickerson*, as Daubenmire testified that he instantly recognized the feel of ammunition. *See Dickerson*, 508 U.S. at 375-76 (stating that "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context"). In short, the pouch of ammunition was properly seized and introduced into evidence at trial.

### C. Competency Examination

Jackson contends that the magistrate judge erred in granting defense counsel's motion for a mental competency examination pursuant to 18 U.S.C. § 4241. Jackson alleges that counsel's motion failed to satisfy § 4241's "reasonable cause" standard and that the magistrate should have held a hearing where Jackson could be present.

A district court's reasonable cause determination is reviewed for abuse of discretion. *Harper v. Parker*, 177 F.3d 567, 571 (6th Cir. 1999); *United States v. Parks*, No. 98-5203, 1999 WL 1045558, at *3 (6th Cir. Nov. 8, 1999) (unpublished per curiam). Abuse of discretion occurs if the court relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard. *Harper*, 177 F.3d at 572 (citation omitted).

A court may order a psychiatric or psychological examination and commit a defendant for a period not to exceed thirty days if the court has "reasonable cause" to believe that the person may be incompetent to stand trial. 18 U.S.C. §§ 4241(a)-(b); 18 U.S.C. § 4247(b); *see generally United States v. White*, 887 F.2d 705, 709 (6th Cir. 1989) (recognizing that under § 4241, "the district court has not only the prerogative, but the duty, to inquire into a defendant's competency whenever there is 'reasonable cause to believe' that the defendant is incompetent to stand trial"). Thus, prior to ordering a competency examination, the court must find reasonable cause to believe the defendant is incompetent. *United States v. Davis*, 93 F.3d 1286, 1290 (6th Cir. 1996) (holding that the district court erred by ordering a competency examination without first finding reasonable cause to believe the defendant was incompetent); *see also Lenhard v. Wolff*, 603 F.2d 91, 93 (9th Cir. 1979) ("Some minimum showing of incompetence must appear before a hearing is necessary."). A defendant's "lack of objection to a competency examination does not justify the order." *Davis*, 93 F.3d at 1290.

The statute does not require an evidentiary hearing to determine reasonable cause. *See United States v. McEachern*, 465 F.2d 833, 837 (5th Cir. 1972) ("The statute does not provide for a framing of issue or a receiving of evidence on the question of cause for belief, so as to allow the court to weigh other facts against the grounds set out in the motion. And no intent to allow the court to engage in such a preliminary weighing of facts can be implied . . . .") (quoting *Krupnick v. United States*, 264 F.2d 213, 216 (8th Cir. 1959));[3] *see also Harper*, 177 F.3d at 572 (same; citing *McEachern*); *United States v. Nichelson*, 550 F.2d 502, 504 (8th Cir. 1977) (per curiam) (stating that 18 U.S.C. § 4244 (the predecessor to § 4241) provides that a district court "shall order a psychiatric examination when a motion thereunder recites 'reasonable cause' to believe that a person charged

[3]*McEachern* construed 18 U.S.C. § 4244 before it was recodified at 18 U.S.C. § 4241.

with an offense against the United States may be 'so mentally incompetent as to be unable to understand the proceedings against him"). Thus, Jackson's argument that he was entitled to a hearing on the reasonable cause question is without merit.

Further, the record supports the magistrate judge's reasonable cause determination. On February 23, 2004, Butler filed a "Motion for Determination of Mental Competency to Stand Trial and Determination of the Existence of Insanity at the Time of the Offense." In the motion counsel stated that he was moving for a competency examination "afer [sic] personally observing the defendant, talking with his mother and his social worker associated with Murtis H. Taylor Health Agency. It is counsel's further understanding that the defendant has recently undergone evaluation and testing for mental illness. Defendant is currently taking medications consistent with a person diagnose [sic] with mental illness." On February 26, 2004, the magistrate judge entered an order granting the motion, on the grounds that it "appear[ed] to the court that there is reasonable cause to believe that the defendant may be so mentally incompetent as to be unable to understand the proceeding against him or properly assist in his own defense"; that it further "appear[ed] to the court that because of the defendant's psychiatric condition he may present a danger to himself or to the community"; and finally that Jackson might "seek to invoke a defense based upon his psychiatric condition."

According to the government, Butler made this motion only after he had observed and interacted with his client at an initial appearance held on February 13, 2004, and a detention hearing conducted on February 19, 2004. The magistrate judge who decided the motion had presided over the earlier proceedings. And, as his motion noted, prior to filing the motion, defense counsel consulted both Jackson's mother and his social worker and learned that Jackson had recently been

tested for mental illness and was taking medications. The government also points out that although not included in his motion, both the magistrate judge and Butler were privy to information in Jackson's Pretrial Services' report, later reflected in his Presentence Report, indicating that Jackson had been referred for a competency evaluation in connection with previous state prosecutions.[4]

 Contrary to Jackson's assertion, there is no requirement in the text of § 4241 that reasonable cause be satisfied by certain proof. Representations by counsel have been held sufficient. *See Nichelson*, 550 F.2d at 504 (finding reasonable cause where counsel's motion stated that he had "reasonable cause" to believe that his client might be presently insane or otherwise mentally incompetent to stand trial); *cf. United States v. Walker*, 301 F.2d 211, 213-15 (6th Cir. 1962) (holding that oral request by court-appointed counsel when considered in conjunction with statements by the defendant and the United States Attorney was sufficient to require the district judge to follow the mandatory provisions of the statute (18 U.S.C. § 4244, predecessor to § 4241)).

Finally, it should be noted that in raising the issue of Jackson's competency, Butler was discharging his "professional duty" as an officer of the court to raise the issue if counsel has a good faith doubt as to the defendant's competence. *See United States v. Boigegrain*, 155 F.3d 1181, 1187 (10th Cir. 1998) (rejecting argument that defense counsel "abandoned his role as the defendant's advocate and therefore rendered ineffective assistance" by raising competency issues against the

---

[4]The government notes that the report furnished to the magistrate judge is not available for inclusion in this record due to Pretrial Services' regulations.

The presentence report states in relevant part that "Prior to the defendant's conviction and sentence, he was ordered to receive a competency evaluation by the Cuyahoga County Court Psychiatric Clinic. The evaluation was completed on January 13, 1995."

defendant's wishes). Indeed, this Court has stated that "[d]ecisions construing [§ 4241] hold that once a motion is made pursuant to it, unless the motion is frivolous or is not made in good faith, the District Judge must appoint a psychiatrist to examine the accused." *Walker*, 301 F.2d at 214.

In sum, these facts were sufficient to support the liberal "reasonable cause" standard of § 4241. The magistrate judge did not err in ordering evaluation.

## D. Speedy Trial Act

Jackson argues his right to a speedy trial under the Speedy Trial Act was violated. The Speedy Trial Act, 18 U.S.C. §§ 3161-74, directs that trial commence within seventy days of the filing of the indictment or the first appearance in court, whichever is later. *See* 18 U.S.C. § 3161(c)(1). However, the Act excludes days from the seventy-day period for various pretrial proceedings, including a delay to determine the mental competency of the defendant. *Id.* § 3161(h)(1)(A).

According to Jackson, 130 nonexcludable days elapsed from indictment to the beginning of trial. However, Jackson concedes that less than seventy days (sixty-three) accrued after the district court received the competency assessment, adopted the Forensic Report's findings, and found Jackson competent to stand trial. Thus, by Jackson's own calculations, his trial complied with the Act's time limitations.

Jackson relies on the alleged defects in the § 4241(a) competency proceedings below, and asserts that the 70-day clock should therefore not be tolled during the entire period his competency was being assessed. This argument is without merit. First, as just discussed, the § 4241 proceedings were properly conducted. Second, the remedy Jackson proposes is not provided for in either § 4241 or in the Act itself.

Courts, including this one, have consistently held that delay resulting from proceedings to determine a defendant's competency is properly excluded from the Act's calculation. *See United States v. Cope*, 312 F.3d 757, 777 (6th Cir. 2002); *United States v. Murphy*, 241 F.3d 447, 455-56 (6th Cir. 2001) (and cases cited therein). That is, "time associated with mental competency examinations are excluded from the Speedy Trial clock." *Murphy*, 241 F.3d at 455-56 (and citations therein); *see also id.* at 456 (holding that "§ 4247(b) does not limit the time excludable under the Speedy Trial Act for mental competency examinations"). This is true even if the defendant personally objects to his counsel's motion for a psychiatric evaluation. *Id.* at 455. Finally, this Court, like others, has refused to use the Act to craft remedies for alleged violations of 18 U.S.C. § 4247's time limitations. *See Murphy*, 241 F.3d at 456-57 (and citations therein); *United States v. Taylor*, 353 F.3d 868, 870 (10th Cir. 2003). Jackson's claim is without merit.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.